# Illinois Official Reports

## Appellate Court

---

### *People v. Joseph*, 2021 IL App (1st) 170741

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LB JOSEPH, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-17-0741 |
| Filed | June 30, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-19077(02); the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and Paul E. Wojcicki, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Presiding Justice Howse and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1        A jury convicted defendant LB Joseph and his codefendant and brother, Leondo Joseph, of aggravated kidnapping, aggravated criminal sexual assault, and aggravated battery. The jury also found that LB was armed with a firearm during the kidnapping and sexual assault.

¶ 2        Codefendant Leondo has filed his own appeal and is not a party to this one. See *People v. Joseph*, 2021 IL App (1st) 171026-U. Here, defendant LB claims the trial court failed to question the prospective jurors in compliance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and that the error, while unpreserved, warrants reversal because the evidence was closely balanced. Defendant also claims the testimony of the victim, L.D., was not sufficient to prove beyond a reasonable doubt that he was armed with a firearm. For the reasons that follow, we affirm.

¶ 3                                              BACKGROUND

¶ 4        Defendant LB and codefendant Leondo waived their respective rights to counsel. They were tried jointly, before a single jury, with each defendant representing himself.

¶ 5        The key witness for the State, particularly for our purposes here, was L.D., the victim of the charged offenses. L.D. testified that she was approached by the defendants on the night of December 17, 2011, while waiting for a bus on a street corner. L.D. gave conflicting accounts of exactly which corner it was, but she was clear that the encounter began late at night, sometime around midnight, when a car pulled up and stopped in front of her.

¶ 6        The driver, defendant LB, rolled down the window to talk to L.D., but she ignored him. LB then got out of the car. He was holding a gun at his side. He walked toward L.D. and said that she had "two options, get in the car or get shot."

¶ 7        L.D. did not know what kind of gun it was. As a general matter, she explained, she "don't know nothing about no guns." As best she could recall, it was not silver or blue steel. By the time of trial, she could not remember whether it was a revolver.

¶ 8        Scared for her life, L.D. got into the front passenger seat. Defendant LB drove around for "a long time" before eventually parking in an alley. Along the way, L.D. noticed codefendant Leondo in the back of the car.

¶ 9        The defendants told L.D. to get into the back seat and take off her clothes. She complied. Over the next several hours, until 8 a.m. or so, the defendants took turns forcing L.D. to perform oral, vaginal, and anal sex. When she tried to escape, codefendant Leondo punched her in the face, below her right eye. Before the trial, she had told the police it was below her left eye.

¶ 10       Sometime after daybreak, another car drove into the alley. The defendants told L.D. to get dressed and let her out of the car at the end of the alley. She went into a nearby business, said she was just raped, and asked to call the police. She was taken directly to the hospital in an ambulance, where she reported that she had been raped orally, vaginally, and anally.

¶ 11       Swabs were taken from L.D.'s mouth, vagina, anus, and underwear. Semen was detected in every sample; there was blood in the underwear sample. Although the DNA analysis was not conclusive, it did show, in sum, that neither of the codefendants could be excluded from the sperm fractions identified in the oral, anal, and underwear samples. The vaginal sample matched codefendant Leondo but not defendant LB.

¶ 12    The State also offered other-crimes evidence to show propensity, *modus operandi*, and lack of consent. Another complainant, D.K., testified to an unrelated incident in which she was abducted off the street and forced to perform oral and vaginal sex on Leondo in the back seat of the defendants' car. LB stood by, waiting for his "turn" (as he called it) with his pants down, only to be interrupted by an approaching police car.

¶ 13    After the State rested, LB called codefendant Leondo to the stand. Leondo testified that he was driving with LB, in an area known for drugs and prostitution, when he saw L.D. standing on a street corner. They pulled up and talked to her. L.D. said that "she was out there dating" and that her pimp "got a little rough with her." After talking and smoking a cigarette together, Leondo offered L.D. $100 for sex. She got into the back seat of the car willingly, and Leondo drove off.

¶ 14    At first, Leondo testified that his brother got out of the car after they parked. He later testified that he dropped LB off at a friend's house along the way. In any event, Leondo and L.D. had oral and vaginal sex, but not anal sex, in the back seat. It was consensual, no force was ever used, and LB did not participate at all.

¶ 15    Afterwards, L.D. demanded more money. When Leondo refused, L.D. grew angry, got out of the car, and slammed the door.

¶ 16    Leondo denied that he had a gun or a knife with him during the encounter. He further testified, in sum, that D.K. was also a prostitute, whom he paid $20 for oral sex.

¶ 17    After the jury returned its verdicts, the trial court sentenced defendant to 147 years in prison. That was the minimum sentence allowed by the confluence of consecutive-sentencing provisions and 15-year firearm enhancements that applied to the aggravated kidnapping and six aggravated criminal sexual assault convictions (two counts each of oral, vaginal, and anal penetration—one committed by defendant himself, and one by Leondo, for whom defendant was accountable). "These are strange sentencing laws," the trial judge lamented, but he lacked any discretion to depart downward from the *de facto* life sentence they generated.

¶ 18                                ANALYSIS
¶ 19                                   I
¶ 20    Defendant argues that the trial court committed first-prong plain error when it failed to ask the prospective jurors whether they understood the principles of a fair trial set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We review the trial court's compliance with Rule 431(b) *de novo. People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 21    Rule 431(b) requires the trial court to "ask each potential juror, individually or in a group, whether that juror understands and accepts" these four principles, commonly known as the *Zehr* principles: (1) that the defendant is presumed innocent, (2) that the State must prove the defendant's guilt beyond a reasonable doubt, (3) that the defendant is not required to offer any evidence on his own behalf, and (4) that the defendant's decision not to testify cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see *People v. Zehr*, 103 Ill. 2d 472, 477-78 (1984).

¶ 22    The trial court must ask prospective jurors two distinct questions: whether they *understand* the *Zehr* principles and whether they *accept* them. Because a fair trial depends on selecting jurors who meet both conditions, omitting either question is error, and the error is reversible, under the plain-error rule, if (but only if) the evidence was closely balanced. *People v. Sebby*,

2017 IL 119445, ¶¶ 49-52; *Belknap*, 2014 IL 117094, ¶¶ 42-46; *People v. Wilmington*, 2013 IL 112938, ¶¶ 32-34.

¶ 23 In a perfect world, the trial court would not stray from those precise terms—whether the jurors "understand" and "accept" the four *Zehr* principles. But in practice, the trial courts often do, leaving reviewing courts to determine whether the words the trial court chose were sufficient to capture the essence of the two required questions. See, *e.g.*, *People v. Morris*, 2013 IL App (1st) 110413, ¶ 83 (" 'understand' and 'embrace' "); *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2010) (" 'have any difficulty' " with and be " 'willing to follow' "); *People v. Ingram*, 401 Ill. App. 3d 382, 393 (2010) (have " 'any difficulty or quarrel with' "); see also *People v. Emerson*, 122 Ill. 2d 411, 427 (1987).

¶ 24 Here, the trial court began its inquiry by reciting each *Zehr* principle and, after each one, asking whether any prospective juror had "any quarrel with" that principle. None did. Defendant concedes that, in doing so, the trial court sufficiently confirmed that the jurors *accepted* the four principles. He raises no claim that the trial court violated the "accept" prong of the Rule 431(b) inquiry and, in fact, concedes that this portion of Rule 431(b) was satisfied. So we need not consider the "accept" portion of the Rule 431(b) requirement further; like defendant, we will focus our inquiry on the "understand" prong of the Rule 431(b) admonishments.

¶ 25 The trial court next asked the prospective jurors to consider the following scenario, meant to illustrate how the *Zehr* principles are to be applied:

"Now, ladies and gentlemen, to give you an idea of the way these four propositions of law work, if you put them all together, if I took the first twelve of you whose names were called right now and gave you your verdict forms and told you to go back in the jury room back there and deliberate and reach a verdict, could you do it?

Right now, somebody out there is thinking, come on, Judge, how am I supposed to decide this case if I haven't heard any evidence? You see, that would be wrong because since the Defendant is presumed to be innocent of the charges against him, and you have heard no evidence to remove that presumption, and since the State has the burden of proving the Defendant guilty beyond a reasonable doubt, you have heard no evidence for them to sustain their burden, and since the Defendant is not required to prove his innocence, you can't consider the fact you haven't heard anything from the Defense, and since the Defendant has the absolute right to remain silent, you can't consider that either for or against him, so the only possible verdict you could have right now would be not guilty. That's the way those four propositions work if you put them all together."

¶ 26 The trial court then asked the prospective jurors, "Is there anybody here who cannot apply those four propositions in the manner that I have indicated? If so, raise your hand." The court noted that the "[r]ecord will reflect there are none."

¶ 27 Defendant then interjected as the judge was about to continue with his Rule 431(b) questioning, resulting in the following:

"MR. L.B. JOSEPH: Excuse me, your Honor.

THE COURT: All right. Then I take it that all of you except—

MR. L.B. JOSEPH: Your Honor, I didn't hear everything that happened, your Honor.

THE COURT: I'm sorry?

- 4 -

MR. L.B. JOSEPH: I didn't hear everything.

THE COURT: I said is there anybody here who cannot apply those four propositions in the manner that I have indicated.

MR. L.B. JOSEPH: Oh, you mean, by not guilty or acquittal of all charges?

THE COURT: Yeah.

MR. L.B. JOSEPH: Okay. No problem.

THE COURT: And is there anybody—all right then.

Anybody here who could not apply those four propositions in the manner I have indicated? If so, raise your hand.

The record will indicate there are none. All right.

*Then I take it that all of you accept and understand these four propositions of law.* If that's not the case, raise your hand.

All right. Record will reflect there are none." (Emphasis added.)

¶ 28    In his attack on the trial court's Rule 431(b) admonishments in his opening brief, defendant focused exclusively on the court's statements to jurors *before* defendant interrupted the admonishments. He overlooked (as did the State) that the court then completed its inquiry with the wrap-up statement, italicized above—"I take it that all of you accept and understand these four propositions of law." That statement, followed by a request for a show of hands if the court's assumption was wrong, was the functional equivalent of a question that sought to confirm the jurors' acceptance and understanding, tracking verbatim the language that Rule 431(b) requires.

¶ 29    In his reply brief, to his credit, defendant recognized his initial oversight. He brought this later passage in the transcript to our attention but claimed that even this wrap-up statement, however closely it tracked the language of Rule 431(b), was error, albeit for a different reason.

¶ 30    He argues that the "accept" and "understand" confirmations must be in the singular, following the recitation of each of the four propositions, rather than listing all of the principles out and then asking summarily if the jury "understands" all four of them collectively. In other words, says defendant, the trial judge must ask eight questions of the jurors—whether they accept each of the four propositions individually and whether they understand each of the four propositions individually. Thus, because the court asked about the jurors' understanding of all four principles collectively, the court never adequately confirmed their understanding.

¶ 31    Again to defendant's credit, he noted that our supreme court had granted leave to appeal in a case involving this very question. And indeed, the supreme court has recently answered the question definitively. In *People v. Birge*, 2021 IL 125644, ¶ 41, the supreme court held that Rule 431(b) was satisfied when the trial court recited all four of the *Zehr* principles in succession, then asked the jurors whether they understood all four of them collectively and whether they accepted all four of them collectively. Our supreme court found "no merit to defendant's argument that the purpose of the rule is thwarted by reciting the four principles together." *Id.* ¶¶ 34, 41 (noting that no "case decided by this court has held that the trial court must recite the principles *separately* to the prospective jurors, and the plain language of the rule *** does not require the court to explain the principles to the jurors in any particular fashion").

¶ 32    Unpublished decisions of this court, to which we can turn for persuasive guidance, have followed *Birge* in finding it proper to recite all four *Zehr* principles in sequence, followed by

a single "accept" question and a single "understand" question. See *People v. Mariani*, 2021 IL App (4th) 190417-U, ¶¶ 58-60; *People v. Kobiela*, 2021 IL App (4th) 190260-U, ¶ 29; *People v. Fitzpatrick*, 2021 IL App (4th) 180687-U, ¶ 30.

¶ 33    To be fair to defendant, however, the court's wrap-up comment to the jurors, assuming that they "understand" the four principles and seeking a show of hands if they did not, came after a brief interruption in the admonishments by defendant's interjection. And the resulting back-and-forth between the court and defendant was a bit confusing and off-point. Arguably, when the court then returned to the four principles and asked whether the jurors understood (and accepted) them, the jurors may have lost the thread of the conversation.

¶ 34    But even if we indulged that possibility and omitted that final wrap-up statement in its entirety—even if we backed the proceedings up to before defendant's interjection—we would still find that the question the trial court asked, after laying out its hypothetical, was sufficient to confirm the jurors' understanding of the four *Zehr* principles.

¶ 35    As noted (*supra* ¶¶ 25-26), after confirming the jurors' acceptance of the four *Zehr* principles, the court ran through a hypothetical that put the four principles into action, followed by this question: "Is there anybody here who cannot apply those four propositions in the manner that I have indicated?" Defendant says that this question was just another way of asking the jurors what the trial court had already asked them—whether they *accepted* the four principles.

¶ 36    We see it differently. While not entirely free of ambiguity, the most natural interpretation of that question, in context, was that the trial court was asking whether the jurors understood how the *Zehr* principles worked in practice. The court outlined a hypothetical that applied the four principles and then asked the jurors if they were capable of applying them in just that way. Asking whether someone "can apply" a principle is most reasonably understood as asking them if they *understand* how that principle works. The ability to apply a rule or principle, in the sense of knowing how to do so, is what we generally mean by "understanding" that rule or principle.

¶ 37    That is why exams, for example—designed as they are to measure understanding—test the students' ability to correctly apply (and not just recite) the rules and principles taught in the course. And that is why jury instructions—designed as they are to convey an understanding of the relevant legal principles—must, as we are apt to say, enable the jurors to correctly apply the law to the evidence to reach a correct verdict. See, *e.g.*, *People v. Delgado*, 376 Ill. App. 3d 307, 314 (2007); *People v. Herron*, 215 Ill. 2d 167, 187-88 (2005).

¶ 38    That is not to say that defendant's argument is without reason. Asking whether someone "can apply" a principle *could* be interpreted as asking whether they are willing to do so—whether they have an objection to doing so—and thus whether they "accept" the principle. There is some degree of ambiguity, in other words, in the word "can." It usually means being capable of doing something (and thus understanding how to do something), but certainly not always. When George Washington famously, if mythically, said that he "cannot tell a lie," he did not mean he was incapable of lying or did not understand how to do so—he was saying that he was *unwilling* to do so. If an employer says that she "cannot recommend" an employee for a promotion or a legislator announces that she "cannot vote for" a piece of legislation, they are obviously not claiming an inability to give a thumbs-up; they are saying they refuse to take those actions.

¶ 39     But that is not the most natural meaning, and particularly not in this context. The court did not simply ask the bald question whether the jurors "can apply" the *Zehr* principles—he was asking whether they could apply them "in the manner that I have indicated?" The far more natural interpretation is that the trial court was asking them if they understood the principles, such that they could apply them in the proper manner, as just explained by the court in its hypothetical example.

¶ 40     We thus reject defendant's claim that the trial court failed to confirm the jurors' understanding of the *Zehr* principles. If the final wrap-up confirmation were not enough in itself, the court's asking the jurors whether they "can apply" the principles was itself sufficient. We find no "clear or obvious error" in the trial court's Rule 431(b) admonishments, the threshold requirement on plain-error review. *Birge*, 2021 IL 125644, ¶ 24.

¶ 41                                                    II

¶ 42     L.D. testified that defendant approached her while carrying a gun at his side and said that she had "two options, get in the car or get shot." Based entirely on this testimony, the jury found that defendant was armed with a firearm during the kidnapping and six distinct acts of sexual assault that followed. Defendant was thus subject to seven consecutive 15-year firearm enhancements, increasing his mandatory minimum sentence by an additional term of 105 years.

¶ 43     Defendant claims this finding was error. He says the uncorroborated testimony of L.D.—who could not describe the gun and who, in her own words, "don't know nothing about no guns"—was not sufficient to prove beyond a reasonable doubt that he was carrying a real firearm, rather than a toy or other look-alike.

¶ 44     If defendant's sufficiency challenge is to succeed, he must show that L.D.'s testimony was so "unreasonable, improbable, or unsatisfactory" that no rational trier of fact, viewing it in the light most favorable to the State, could accept it as proof beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008); see *Jackson v. Virginia*, 443 U.S. 307 (1979). The trier of fact's findings regarding the credibility of witnesses and the inferences to be drawn from the evidence are not conclusive, but they are entitled to significant deference. *Ross*, 229 Ill. 2d at 272.

¶ 45     For the enhancements to apply, the State had to prove that defendant was "armed with a firearm." 720 ILCS 5/10-2(a)(6) (West 2012) (aggravated kidnapping); *id.* § 11-1.30(a)(8) (aggravated criminal sexual assault). Unless a specific provision states otherwise, the term "firearm," when used in the Criminal Code of 2012, "has the meaning ascribed to it in Section 1.1 of the Firearm Owners Identification Card Act." *Id.* § 2-7.5.

¶ 46     The Firearm Owners Identification Card Act (FOID Act) defines a firearm as follows: "[A]ny device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas," but excluding, among other items, pneumatic, spring, paint ball, and BB guns and certain antique firearms. 430 ILCS 65/1.1 (West 2012).

¶ 47     Because the term "firearm" bears this "technical" meaning, defendant argues, the State must prove that an alleged firearm was designed to expel projectiles of a relevant type in one of the specific "manners" listed in the definition. Direct evidence of the design and functionality of the alleged firearm is necessary, he urges, to rule out the possibility that it was

a just BB gun, for instance, or some other type of "gun" that the statutory definition of a firearm specifically excludes.

¶ 48     This burden of proof would easily be satisfied when a witness with a working knowledge of firearms can inspect the device in question. And it would presumably be satisfied by evidence that the defendant used the device to "expel a projectile" of a relevant type during the offense.

¶ 49     But in this case and in countless others like it, the alleged firearm was neither discharged nor recovered, so the only relevant evidence is an eyewitness's testimony that the defendant had a gun. Defendant argues that such "conclusory" testimony generally cannot prove beyond a reasonable doubt that the gun was a real firearm, as defined by the FOID Act.

¶ 50     After all, he says, appearances often deceive. Not everything that looks like a real firearm turns out, upon inspection, to be one. So much so that even "trained police officers" mistake BB guns or other toys for real firearms when sizing them up on the fly, as a host of tragic cases cited by defendant reminds us. Even less can we expect the average witness, lacking training and experience with firearms, to reliably distinguish a real one from a realistic toy—and to do so, no less, based on whatever observations the witness can muster as the gun is brandished during a criminal offense.

¶ 51     Defendant's concerns are not unreasonable. In real time, it can be difficult indeed to distinguish real firearms from, say, air guns—especially the air guns that are selected for use in coercive criminal acts, "where they would lose most of their efficacy" if they were recognized for what they really are. *United States v. Bey*, 748 F.3d 774, 777 (7th Cir. 2014).

¶ 52     That said, our supreme court has held that such eyewitness testimony *can* prove beyond a reasonable doubt that a defendant possessed a real firearm. The clearest example of this holding from our supreme court is *People v. Wright*, 2017 IL 119561. The issue in *Wright* was whether the codefendant "possessed a firearm, as defined in the FOID Act." *Id.* ¶ 76. Because the alleged firearm was neither discharged nor recovered, the only evidence that it was a real firearm came from the witnesses who saw it during the armed robbery and testified that they "believed" it was, or that it " 'looked like,' " a semiautomatic handgun. *Id.* That testimony alone was sufficient evidence that the codefendant possessed a firearm. *Id.*

¶ 53     In reaching that conclusion in *Wright* (*id.*), the supreme court took the "rationale" of *People v. Washington*, 2012 IL 107993, to be "controll[ing]." In *Washington*, the victim testified, in sum, that the defendant pointed "a gun" at him and forced him into a truck, where the "gun" was then held to his head. *Id.* ¶ 35.

¶ 54     It is true, as defendant notes here, that the precise question in *Washington* was whether there was sufficient evidence of a "dangerous weapon," a broader statutory category than "firearm." *Id.* ¶¶ 1, 5-7; see 720 ILCS 5/33A-1(c) (West 2012). But the supreme court expressly found that "the jury could have reasonably inferred" from the victim's testimony that "defendant possessed *a real gun*." (Emphasis added.) *Washington*, 2012 IL 107993, ¶ 36.

¶ 55     In so finding, the supreme court in *Washington* rejected the argument that, because the gun was not recovered, "it could not be known for sure whether the gun was real or a toy." *Id.* And if the victim's testimony was sufficient to prove beyond a reasonable doubt that the "gun" was real, it was sufficient to prove not only that the "gun" was a dangerous weapon but also that the "gun" was a firearm within the meaning of the FOID Act. *Id.* ¶ 37; see *Wright*, 2017 IL 119561, ¶ 76.

¶ 56        Our supreme court's latest word on this topic came in *People v. McLaurin*, 2020 IL 124563, issued after defendant filed his opening brief. Defendant thus relied on the appellate opinion in *People v. McLaurin*, 2018 IL App (1st) 170258, in which we reversed the trial court's finding that the defendant possessed a firearm—only to be reversed, in turn, by the supreme court.

¶ 57        In *McLaurin*, an officer saw the defendant walk out of a building carrying a silver or chrome handgun. *Id.* ¶¶ 3, 5. She had an unobstructed view, from about 50 feet away, in the middle of the day. *Id.* ¶ 3. But the defendant was holding the gun by the barrel, so she could not tell what kind of gun it was, or even whether it was a revolver or a semiautomatic. *Id.* ¶ 6.

¶ 58        In our appellate decision, we took the trial court's finding to be based entirely on the "circumstantial evidence" provided by this officer's testimony, and we found that her testimony, on its own, did not prove beyond a reasonable doubt that the item she saw satisfied the specific criteria set forth in the statutory definition of a firearm. *Id.* ¶¶ 22, 24, 28.

¶ 59        In reversing our judgment, the supreme court reiterated that, under *Washington* and *Wright*, circumstantial evidence alone, in the form of eyewitness testimony, can prove that a defendant is armed with a firearm. *McLaurin*, 2020 IL 124563, ¶¶ 17, 24-31. The supreme court also cast doubt on the conclusion that this particular officer's testimony would not suffice, on its own, to sustain the trial court's judgment. See *id.* ¶¶ 35-36. But the supreme court did not have to answer that question definitively, because the officer's testimony was not the only evidence that supported the judgment.

¶ 60        After the defendant in *McLaurin* left the building, carrying a supposed handgun, he got into a van, which was stopped and searched a few minutes later. *Id.* ¶¶ 4-9. The officers did not find a gun inside the van or on any of the occupants, but they did find one directly underneath the van, and it matched the general description, in terms of size and color, of the supposed handgun that the defendant was seen carrying into the van. *Id.* ¶¶ 6-8. Thus, it was reasonable to infer that it was the same handgun. See *id.* ¶ 37. And although the State chose not to introduce the handgun into evidence, the officer who found it did testify that it was a loaded .9-millimeter, from which he removed a magazine and found another bullet in the chamber. *Id.* ¶¶ 8, 32.

¶ 61        To this extent, the evidence in *McLaurin* was different in kind than the evidence in *Washington*, *Wright*, or this case. The officer who found the gun in *McLaurin* did not merely see it in someone's hand; he held it in his own hands and verified that it was loaded with bullets—not with BBs or pellets or whatever else. That is direct, rather than circumstantial, evidence that the gun was a real firearm. And it should be proof enough for any reasonable trier of fact.

¶ 62        On a close reading of its facts, *McLaurin* does not (because it was unnecessary to) squarely answer the question defendant has put to us: whether an eyewitness who sees an apparent gun in a defendant's hand can provide sufficient evidence that it was a *firearm*, and not something that merely *looked like* a firearm. *Washington* and *Wright*, however, do answer that question head-on, and *McLaurin*, if nothing else, leaves those holdings undisturbed.

¶ 63        Together, these cases tell us that defendant sets the bar too high. To prove beyond a reasonable doubt that a defendant was armed with a firearm, the State generally does not need to offer direct evidence of the alleged firearm's "design" or its precise method of expelling projectiles, as defendant would have us require. And a single witness, with no training, experience, or knowledge of firearms, is enough. The witness need not provide any meaningful

description of the gun. Nor, for that matter, does any witness need to see the whole gun, much less see it for more than a brief moment or from a favorable vantage point.

¶ 64        True, in *Washington*, *Wright*, and the appellate decisions cited by the State, the testimony had at least *some* feature(s) along these lines to (arguably) bolster its claim of reliability. *Wright*, 2017 IL 119561, ¶¶ 9,12 (multiple witnesses, some claiming firearms experience; description of gun); *Washington*, 2012 IL 107993, ¶ 35 (arguably better vantage point; more time to observe); *People v. Toy*, 407 Ill. App. 3d 272, 293 (2011) (multiple witnesses); *People v. Lee*, 376 Ill. App. 3d 951, 953 (2007) (multiple witnesses; description of gun).

¶ 65        In contrast, L.D.'s testimony about the gun exhibited no such features. For this reason, defendant argues, it was simply too thin and unreliable to prove beyond a reasonable doubt that he was armed with a firearm. And that is particularly so, he claims, when L.D. conceded that she knew nothing about guns.

¶ 66        But her testimony on that last point bears further scrutiny. This was the exchange on cross-examination that yielded that statement:

> "Q. What type of gun was it?
>
> A. I don't know nothing about no guns, so I don't know what kind of gun it was."

¶ 67        There is a difference, in our view, between not being able to recognize a gun as a gun, on the one hand, and not being able to distinguish between a Glock versus a Ruger, a 9-millimeter versus a .44 Magnum, or a semiautomatic versus an automatic. L.D.'s answer was that she could not tell the *type* of gun, which puts her in company with a fair number of citizens of this state who lack this level of familiarity with firearms.

¶ 68        Indeed, L.D.'s testimony in that regard is not different from the victim in *Washington*, 2012 IL 107993, ¶¶ 10, 35-36, who did not describe the gun in the slightest—he simply declared that it was a "gun"—nor did he claim to know the first thing about guns. Yet the supreme court found that his testimony was proof beyond a reasonable doubt that the defendant was carrying "a real gun." *Id.* ¶ 36. It would be inconsistent with our supreme court precedent to hold that only witnesses who understand the finer points of firearms are able to distinguish between a real gun and a fake one.

¶ 69        We would add here a couple of points. First, L.D. did not merely see the handle of the weapon or see it only in the flash of an instant; she saw defendant get out of the car and walk toward her while holding the gun:

> "Q. What, if anything, did you notice when he got out of the car and came toward you?
>
> A. A gun.
>
> Q. And where was that gun?
>
> A. On his side. He had it in his hand.
>
> ***
>
> Q. And when you saw that person approaching you with the gun what happened?
>
> A. He approached me with the gun. He walked to me and told me I got two options, get in the car or get shot."

¶ 70        The evidence did not pin down the precise window of time that passed. It would appear to be not particularly long, but it certainly was more than an instantaneous glance. Indeed, L.D.'s

testimony indicated that defendant threatened her with the weapon, indicating that he was not shy about calling it to her attention; he at least wanted her to believe it was a real gun.

¶ 71 Which leads to our final point—the fact that defendant threatened her with the weapon. A defendant's threat to shoot a victim is circumstantial evidence that he was armed with a firearm. *Lee*, 376 Ill. App. 3d at 956; *Toy*, 407 Ill. App. 3d at 289 (threat to kill victim was circumstantial evidence defendant armed with firearm); *People v. Garcia*, 229 Ill. App. 3d 436, 439 (1992) (threat to shoot victim was circumstantial evidence defendant armed with dangerous weapon).

¶ 72 True, defendant could have been faking it, so to speak—threatening to shoot her with something that was not actually a firearm but rather an air gun or similar dangerous weapon that does not qualify as a firearm. But that is not its most natural and ordinary meaning, nor is it the interpretation most favorable to the State. Viewed in that light, a rational trier of fact could (and probably would) take it as a threat to "shoot" L.D. in the usual sense of the term— with a gun, a real gun, and hence with a firearm.

¶ 73 In sum, we must acknowledge the standing "possibility" that L.D. "saw a toy," but such possibilities alone, as we said in *People v. Austin*, 2017 IL App (1st) 142737, ¶ 69, do not "rise to the level of reasonable doubt." The evidence that defendant was armed with a firearm, as defined by the FOID Act, was far from overwhelming. But it was sufficient. A rational trier of fact could draw this inference from L.D.'s testimony that he had a gun and threatened to shoot her if she did not get into the car.

¶ 74 We thus reject the challenge to the sufficiency of the proof.

¶ 75                                                  CONCLUSION

¶ 76 The judgment of the circuit court is affirmed.

¶ 77 Affirmed.