2024 IL App (1st) 230327-U

No. 1-23-0327

Order filed April 12, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 4136 |
| | ) | |
| JALEN SCHAFFER, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for armed robbery and aggravated battery affirmed where the victim's credible testimony was sufficient to establish beyond a reasonable doubt that a co-offender was armed with a firearm during the offenses.

¶ 2    Jalen Schaffer contends that the State failed to prove that a co-offender possessed a firearm during the offenses. Schaffer claims that the victim's testimony that he saw a firearm was inconsistent and contradicted by a video recording that did not depict a firearm. Schaffer asks that

his conviction for armed robbery be reduced to robbery and the case remanded for resentencing on the lesser offense.

¶ 3    We affirm. The State proved that Schaffer knowingly took property from the victim by force or threat of the imminent use of force while an unnamed co-offender was armed with a firearm. The surveillance video did not contradict the use of a firearm, which was described by the victim, though not visible in the video.

¶ 4                                    Background

¶ 5    At trial, Gregory Keller testified that he was riding home from work on a southbound CTA Red Line train. A man approached and asked him if he needed marijuana. Keller declined, and the man left the train. A few minutes later, another man, later identified as Schaffer and three other men approached Keller. Schaffer sat across from Keller; one man stood on each side of Keller, and one stood near the train's door. Schaffer asked Keller if he had marijuana. Keller replied he had a small amount, removed it, and showed it to Schaffer.

¶ 6    Schaffer took the marijuana, smelled it, and returned it. Schaffer told Keller to "run" his pockets. Keller did not understand "run." The man standing to Keller's left struck Keller in the forehead with an object, and the four men attacked him. Keller realized he was being robbed and that "run" meant to remove everything from his pockets.

¶ 7    Keller testified that the co-offender struck him with a chrome "pistol like a .25 automatic handgun." Keller added, "it was small enough to fit in his hand, and when he struck me, I'd seen the chrome part, and I'd seen the little black handle. I had a few guns in my lifetime and I knew it didn't look like a .9 or .380. I know it was a small gun that you could put in your hand and then

when I got hit with it I just started gushing with blood and that's when all of them rushed me." The prosecutor asked Keller if he could tell it was "a real gun." Keller replied, "[y]es."

¶ 8    The men took Keller's belongings, including his cell phone. They dragged Keller down the aisle, ripped his pants, and took his wallet and "work ID." A box cutter Keller used at work fell out of his jacket pocket. One of the co-offenders grabbed it and stated, "[h]e got a knife on him. I should pop him." Keller explained that "pop" meant "he should shoot me, pop a cap in me." While making this statement, the co-offender had raised the front of his shirt near his waistline, and Keller saw "the little handle" of the same gun he "got hit with."

¶ 9    Keller broke away from the men, went to the rear of the train, and pulled down an emergency lever to stop the train. The train did not immediately stop. The four offenders ran through multiple train cars through the emergency doors. As the train slowed and approached the station at 47th Street, Keller pushed the intercom button and told the train operator that he had been robbed and that the offenders were running off the train. Keller also got off at 47th Street and told the CTA customer service agent what had just occurred. The CTA agent called the police and an ambulance. Keller's forehead was still bleeding. Keller showed the court a "gash" on his forehead from the attack.

¶ 10    Keller testified that he had handled guns "[a]bout seven times." When he saw the gun, there was no indication that the gun was not real.

¶ 11    Keller confirmed that a surveillance video on the train accurately depicted the attack. The State played multiple segments of the surveillance video. Keller also confirmed that he could not identify any offender when the police showed him a photo array.

¶ 12    On cross-examination, Keller confirmed that when the co-offender raised his shirt and showed him the gun, Keller already knew that offender had a gun because he had used it to pistol-whip him. Defense counsel asked Keller if he had seen a gun on the video. Keller replied, "I got hit with something. I thought it was a gun so I don't know what they did but –." Counsel interrupted Keller, but the court told Keller to finish his answer. Keller testified, "I got hit with something silver in my head and I don't know if you-all were able to see it or not but that's what I got hit with. That's what made me fall down and made them get on me like that. That's what I remember." Keller acknowledged he did not see a gun on the video but saw it in person during the attack.

¶ 13    The trial court viewed the surveillance video, showing Keller facing the aisle next to the train door. Schaffer entered the train car through the emergency door from the adjoining car, followed by three young men. Schaffer sat in the seat directly across and began speaking. The three other men surrounded Keller and simultaneously attacked him, punching him and then dragging him down the aisle. Keller broke free and pulled the emergency lever that opens the doors. A gun is not visible in the video.

¶ 14    Chicago police officer Conor Strauss testified that he spoke with Keller at the CTA station after the robbery. Keller was distraught and had injuries on his face and a cut on his lip. The State presented about one minute of Strauss's body camera video, which depicted Keller's injuries.

¶ 15    The State presented a stipulation that Chicago police officer Meeks would testify that he responded to a call at a CTA Red Line platform and saw Schaffer, whom he would identify in court, wearing a green jacket, white face mask, and black winter cap. The State presented 13 seconds of Meeks's body camera video that showed Schaffer and a few other young people talking to police on the train platform at the Roosevelt station.

¶ 16    Chicago police detective Paul Urban testified that while investigating the armed robbery of Keller, he recovered the surveillance video from the CTA train and platform. The next day, Urban was informed that there was an assault in progress on the CTA Red Line near the Roosevelt station and that the offenders appeared to be the same men who robbed Keller. Urban watched a live feed of the Roosevelt platform and later watched a body camera video from the officers who stopped the men. Schaffer was one of the men stopped. Schaffer was wearing the same clothing as the day before. Urban identified Schaffer in court.

¶ 17    Additionally, Urban identified three photographs of sequential still images he took from the video of Keller being robbed. Urban identified Schaffer in the photos. Urban testified that the first photograph showed Schaffer standing with an open hand near Keller. The second photo showed Schaffer bent down, reaching toward Keller. The third photo showed Schaffer standing up holding a cell phone. Urban also identified a still image of Schaffer from the day after that he took from an officer's body camera video.

¶ 18    Schaffer was arrested on February 25, 2021. Schaffer identified himself in the four photos described during the videotaped statement to Urban. The State played a segment of Schaffer's videotaped statement in which Schaffer identified himself in the photos, stated that he never struck Keller, and claimed the cell phone was his own.

¶ 19    Schaffer testified that on the day of the incident with Keller, he was riding the CTA Red Line train alone, going home, when he ran into some people he knew. Schaffer asked Keller if he could smell the marijuana Keller had just bought from one of the men in Schaffer's group. Schaffer never struck Keller or took items from him. Schaffer claimed he was holding his own cell phone in the photo Urban discussed. Schaffer testified that he pushed the other men away from Keller

and stopped the attack. Neither Schaffer nor any of the men in his group had a gun, and Schaffer never saw anyone in his group flash a gun.

¶ 20 On cross-examination, Schaffer acknowledged that he sat directly across from Keller on the train, and the other three men stood around Keller. Schaffer smelled Keller's marijuana to see how potent it was. When the three men jumped on top of Keller and were beating and kicking him, Schaffer stood up and hovered over Keller. Schaffer maintained that he pushed the men away from Keller and "was being a Good Samaritan" when he stopped the attack. While the State replayed the surveillance video, Schaffer acknowledged that his hands were initially empty. After he leaned in close to Keller, an object appeared in Schaffer's left hand that "could" have been a cell phone, and Schaffer placed it in his own pocket. Schaffer confirmed that the video did not show him pushing anyone away from Keller or stopping the attack.

¶ 21 In closing, defense counsel argued that the State failed to prove that anyone possessed a gun during the offense, and no gun was seen on the surveillance video.

¶ 22 The trial court found all the State's witnesses' testimony credible, and Schaffer's testimony was "utterly unworthy of belief." The court stated that the issue was whether the State had proven a firearm had been used in committing the offenses. The court further stated,

> "Mr. Keller has testified that he has familiarity with guns; he's seen and handled guns on about five or six occasions and he was struck with what he believes was a small firearm, perhaps, a .22 or a .25, that fit in the palm of one of these persons and when he was struck it caused a gash on his forehead, a busted lip which caused bleeding."

The court acknowledged that a gun was not visible on the video and commented, "but there's a lot of things you don't see on this video." The court pointed out that none of the offenders' hands, other than Schaffer's, could be seen on the video.

¶ 23    The trial court concluded that the State proved beyond a reasonable doubt that the offenses had been committed with a firearm and found Schaffer guilty of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2020)), aggravated battery of a transit passenger (720 ILCS 5/12-3.05(d)(7) (West 2020)), and aggravated unlawful restraint (720 ILCS 5/10-3.1 (West 2020)). The court merged the aggravated unlawful restraint offense into the armed robbery offense. It sentenced Schaffer to concurrent prison terms of 25 years for the armed robbery and 5 years for the aggravated battery.

¶ 24                                    Analysis

¶ 25    Schaffer solely contends that the State failed to prove beyond a reasonable doubt that a co-offender possessed a firearm during the offenses. Schaffer claims that Keller's testimony that he saw a firearm was inconsistent and contradicted by the surveillance video, which did not depict a firearm. Schaffer argues that Keller never explained how he knew the gun was real. Schaffer further contends Keller "backpedaled" from his claim that he was struck with a gun when he testified, "I got hit with something. I thought it was a gun." Schaffer asserts that Keller did not mention the gun to the police until several minutes into their discussion at the CTA station.

¶ 26    When a defendant claims the evidence is insufficient to sustain his conviction, we determine whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the elements of the offense proved beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This

standard applies whether the evidence is direct or circumstantial, and we will not substitute our judgment for that of the fact finder on issues involving credibility and the weight of the evidence. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009). On review, we draw all reasonable inferences from the evidence in the State's favor. *People v. Jones*, 2023 IL 127810, ¶ 28.

¶ 27    In a bench trial, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). In weighing the evidence, the court need not disregard the inferences naturally flowing from the evidence or search for a possible explanation consistent with innocence and raise it to the level of reasonable doubt. *Jackson*, 232 Ill. 2d at 281. We will not reverse based on insufficient evidence unless the evidence is so improbable or unsatisfactory that there is reasonable doubt of guilt. *Jones*, 2023 IL 127810, ¶ 28. Nor will we reverse because a defendant claims a witness was not credible or the evidence was contradictory. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 28    To prove Schaffer guilty of armed robbery, the State had to establish that he knowingly took property from Keller by using force or threatening the imminent use of force while he carried on or about his person or was otherwise armed with a firearm. 720 ILCS 5/18-2(a)(2) (West 2020). Here, an unnamed co-offender was armed with a firearm. Schaffer has not challenged, either at trial or on appeal, his accountability for his co-offender's possession of a firearm. Schaffer also does not challenge the elements of the offense. The only issue is: Did the State prove the co-offender was armed with a firearm?

¶ 29    Section 2-7.5 of the Illinois Criminal Code of 2012 states that a "firearm" is defined as provided in section 1.1 of the Firearm Owners Identification Card Act (FOID Act). See 720 ILCS

5/2-7.5 (West 2020); 430 ILCS 65/1.1 (West 2020). A "firearm" refers to "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2020). The definition excludes items, including B-B guns, pneumatic guns, spring guns, paint ball guns, signaling devices, and antique firearms. *Id.*

¶ 30     Our supreme court has repeatedly held that the testimony of a single eyewitness suffices for a rational trier of fact to infer that a defendant possessed a real firearm within the meaning of the FOID Act. See *People v. Washington*, 2012 IL 107993, ¶ 36 (holding jury could reasonably infer defendant possessed real gun based on witness's unequivocal testimony and circumstances under which he was able to view gun); *People v. Wright*, 2017 IL 119561, ¶¶ 76-77 (applying rationale from *Washington* to reach same disposition). In *McLaurin*, the court reiterated and applied its rationale from *Washington* and *Wright. McLaurin*, 2020 IL 124563, ¶¶ 29-32.

¶ 31     Following *Washington*, *Wright*, and *McLaurin*, this court has expressly held that, for a witness's testimony to be sufficient, the witness doesn't need to describe the firearm with specificity or have a familiarity or experience with firearms. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 84; *People v. Joseph*, 2021 IL App (1st) 170741, ¶ 63. Nor need a witness see the entire firearm, "much less see it for more than a brief moment or from a favorable vantage point." *Joseph*, 2021 IL App (1st) 170741, ¶ 63. Moreover, this court has consistently found "[a] defendant's threat to shoot a victim is circumstantial evidence that he was armed with a firearm." See *id.* at ¶ 71.

¶ 32     Viewed in the light most favorable to the State, the record reveals that from Keller's testimony alone, the trial court could infer that one of Schaffer's co-offenders was armed with a real firearm. Keller unequivocally testified that a co-offender struck him in the forehead with a

chrome "pistol like a .25 automatic handgun." Keller described specific details of the gun, explaining that "it was small enough to fit in his hand," had a "chrome part," and a "little black handle." Keller discussed his familiarity and personal experience with firearms, stating he "had a few guns in my lifetime," handled guns "[a]bout seven times," and "knew it didn't look like a .9 or .380." Keller affirmed that he could tell the firearm was a "real gun." Thus, the record shows that Keller's testimony went beyond what the court needed to find it sufficient. *Moore*, 2023 IL App (1st) 211421, ¶ 84; *Joseph*, 2021 IL App (1st) 170741, ¶ 63.

¶ 33    The record further shows that Keller saw the firearm a second time when the co-offender lifted his shirt and displayed the gun in his waistband. Keller testified that he again saw "the little handle" of the same gun "he got hit with." Keller's testimony revealed that the co-offender stated, "[h]e got a knife on him. I should pop him," which Keller understood meant "he should shoot me." The co-offender's threat was circumstantial evidence from which the trial court could infer that the co-offender was armed with a real firearm. *Joseph*, 2021 IL App (1st) 170741, ¶ 71.

¶ 34    The trial court determined the credibility of Keller's testimony and drew reasonable inferences from the evidence. *Siguenza-Brito*, 235 Ill. 2d at 228. The court found Keller's testimony credible, expressly noting Keller's "familiarity with guns" and description of the "small firearm." Under *Washington*, *Wright*, and *McLaurin*, we find no reason to disturb the finding that Keller's testimony sufficiently established that the co-offender was armed with a real firearm, as defined in the FOID Act. *McLaurin*, 2020 IL 124563, ¶¶ 29-32.

¶ 35    In reaching this conclusion, we find no merit in Schaffer's argument the surveillance video contradicted Keller's testimony about the firearm. Both Keller and the trial court acknowledged that the firearm was not visible in the video. Contrary to Schaffer's argument, Keller did not

"backpedal" that a co-offender had a gun. Instead, Keller remained adamant that he was struck with a firearm, "I don't know if you-all were able to see it or not but that's what I got hit with." Keller testified that the gun was "small enough to fit in his hand."

¶ 36    The trial court also commented, "there's a lot of things you don't see on this video," and specifically pointed out that none of the offender's hands, other than Schaffer's, could be seen on the video. The record shows that the trial court found no merit in defense counsel's argument that the State failed to prove that anyone possessed a gun because no gun was depicted in the video. We concur that the video evidence was not contradictory. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 37    Finally, Schaffer's claim that Keller did not mention the firearm to the police until some 12 minutes into his interaction with them is based on a portion of the video evidence that was not admitted at trial and, therefore, is not properly before us. *People v. Velez*, 388 Ill. App. 3d 493, 502 (2009). The State admitted less than one minute of the video from Strauss's body camera depicting the officer's interaction with Keller at the CTA station. The prosecutor started the video "at 1 minute and 55 seconds" and stopped the video "at 2 minutes and 44 seconds." The segment Schaffer relies on, from "12:35-13:53," was not admitted at trial. So, we do not consider this contention. *Id.*

¶ 38    Affirmed.