# Illinois Official Reports

## Appellate Court

> ### *People v. Collins*, 2021 IL App (1st) 180768

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEERIC COLLINS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-18-0768 |
| Filed | August 27, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 15-CR-17608, 15-CR-17609; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Andrew Thomas Moore, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Hareena Meghani-Wakely, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Connors and Oden Johnson concurred in the judgment and opinion. |

¶ 1        Following a jury trial, defendant Leeric Collins was convicted of two counts of armed robbery and sentenced to concurrent prison terms of 35 years. On appeal, he contends that the State (1) failed to prove him guilty beyond a reasonable doubt of one of the offenses, (2) elicited inadmissible hearsay, (3) made improper argument, and (4) failed to prove beyond a reasonable doubt that he used a firearm in his offenses so they were robbery rather than armed robbery and he should be resentenced. Relatedly, he contends that the trial court erred by not properly instructing the jury on the statutory definition of a firearm. For the reasons stated below, we affirm.

## I. JURISDICTION

¶ 2

¶ 3        A jury found defendant guilty in October 2017, and the trial court sentenced him on February 15, 2018. This court granted him leave to file a late notice of appeal on April 30, 2018. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Mar. 12, 2021) governing appeals from a final judgment of conviction in a criminal case.

## II. BACKGROUND

¶ 4

¶ 5        Defendant was charged in relevant part with multiple counts of armed robbery with a firearm. In case No. 15-CR-15767, he allegedly robbed Mussie Abreha on or about September 5, 2015. In case No. 15-CR-17608, on September 7, 2015, he allegedly robbed Mohamed Maaref of currency and a cell phone and also allegedly committed aggravated battery by striking Maaref on the head with a firearm knowing him to be a cab driver. In case No. 15-CR-17609, he allegedly robbed Fahad Baig (or Baij) of a debit card, currency, and a wallet on or about September 5, 2015.

¶ 6        The court joined the three cases for trial on the State's allegations that all three victims were cab drivers robbed at gunpoint by a passenger in the early morning (from 12:35 a.m. for Abreha to 5:41 a.m. for Baig) within a three-day period, with two robberies (of Maaref and Baig) at essentially the same location. The case went to trial on the charges of armed robbery of Abreha, Baig, and Maaref, with other charges nol-prossed.

¶ 7        At trial, Wanda Stryck testified that she was an employee of the Carriage Cab Company, which installed cameras in its cabs, and part of her job was to download the images and video from those cameras. Unless triggered to take additional photographs by incidents such as a U-turn, sudden stop, or impact, the cameras would capture images inside and outside the cab about every seven seconds, including the cab number, date and time, and location data. The drivers could not turn the cameras on or off nor tamper with them in any way. In particular, the cabs driven by Abreha and Maaref had such cameras, and Stryck processed a police request for the video from the cabs of Abreha and Maaref on September 5, 2015, by providing those videos on disks and also providing the police still images from those videos. The videos and still images were in the same condition as when Stryck downloaded them, and they were shown at trial.

¶ 8        On cross-examination, Stryck acknowledged that no passenger in the video or images from Abreha's cab is seen holding an object that resembles a gun. On redirect examination, she reiterated that there would be gaps in the video and images because they were captured every seven seconds rather than continuously. On recross examination, she admitted that not all the gaps were as long as seven seconds but could not recall if some were as short as two seconds. Continuous video would be triggered by the cab driving in reverse at a high rate of speed.

¶ 9        The videos and still images from Abreha's and Maaref's cabs show the taxi number, date and time, and location data in latitude and longitude, and the video from both cabs shows views of the driver, passenger, and exterior of the cab. Defendant's face is clearly visible as the passenger in both videos. Only the video from Maaref's cab shows defendant with a gun, a small semiautomatic pistol pointed toward Maaref. The image is not in color, but the gun is two-toned, a darker dull (that is, not shiny) metallic on top and a lighter color by the handgrip. Maaref flinches, raises his hands, and quickly passes a dark bag back to defendant. There is intermittent audio in the video from Maaref's cab, and a male voice says near the end of the video "You come back over this way, you gonna [*sic*] die, alright?" and another male voice immediately replies "OK."

¶ 10        Abreha testified that he was working as a cab driver shortly after midnight on September 5, 2015, when defendant hailed his cab in the vicinity of Sedgwick and Schiller Streets in Chicago. Defendant directed him toward a destination, last telling him to turn from Division Street onto Cleveland Avenue. After a couple of blocks, the street dead-ended and defendant told Abreha to stop, then demanded his money. Abreha turned around and saw that defendant had a small metallic gun, silver but not particularly shiny. Abreha was very afraid, assured defendant that he would give him the money, and then did so. He believed he handed defendant $70 or $80. Defendant then fled on foot southward, in the direction of Chicago Avenue. Abreha drove to a more heavily trafficked area and called the police, who he provided a description of the robber.

¶ 11        A few days later, on September 9, Abreha went to the police station and viewed a photographic array, from which he identified defendant's image as depicting the robber. Abreha was aware of the cameras in his cab but had no control over them. Some days after the incident, the cab company showed Abreha the video from his cab from the night in question. When shown the video again at trial, Abreha pointed out himself and defendant. He acknowledged that the video did not show defendant holding a gun but maintained that he did so. Abreha identified a photograph of fellow cab driver Maaref and also identified Maaref in still images from one of the cab cameras.

¶ 12        On cross-examination, Abreha testified that he never saw defendant before that night. He could not recall how much time passed between when defendant fled and calling the police, but it may have been less than 10 minutes. He saw only the video from his own cab at the cab company after the incident. He denied telling police that the gun was black. On redirect examination, he testified that there was no divider between the front and rear seats of his cab.

¶ 13        Baig testified that he was working as a cab driver on the night of September 4 and 5, 2015, and was about to end his shift after 5 a.m. when he picked up one last fare, a man who hailed him near Chicago Avenue and La Salle Street in Chicago. The man was alone and waving money, and Baig stopped for him "[s]keptically." At trial, Baig identified defendant as that man. Defendant provided Baig a destination, the intersection of Chicago Avenue and Drake Avenue. After some "small talk" at the beginning of the ride, defendant asked questions like

"are your cameras working, do you have a carry and conceal license, do you have change for a hundred dollar bill." Baig told defendant that the cameras were working, he had no concealed carry license, and could not make change for $100, though in fact he had "plenty of money." When Baig turned from Chicago Avenue onto Drake Avenue as directed, he found that Drake Avenue was a dead end. Baig stopped the cab and asked for the fare, but defendant pulled out a gun and demanded everything Baig had or "I'll shoot you, I'll kill you." He pointed his two-toned (that is, black and silver) semiautomatic pistol at Baig, who put his hands up, begged defendant not to kill him, and gave him over $300. Defendant exited the cab but continued pointing the gun at Baig and demanded that he exit the cab and open the trunk. Defendant searched the trunk, expressing his belief that Baig did not give him all his money and repeating his threat to shoot Baig. He also demanded Baig's wallet, which he had left in the cab when he gave defendant the money, and Baig complied. The wallet contained various cards including a debit card, and defendant demanded the access code; Baig gave him a false code. When a car approached, defendant hid the gun and told Baig to go back into the cab. Defendant left on foot, and Baig drove away, looking for defendant on Chicago Avenue as he called the police.

¶ 14    At some point during the robbery, defendant ripped the visible cameras from their connections. The cab video was not downloaded, as Baig's cab was owned by his father and he did not tell his parents of the robbery lest they tell him to stop being a cab driver, nor did he ask the cab company to download the video as someone there would have told his father. He could not retrieve the video himself, and by the time he decided he wanted the video, he was told it was unrecoverable. Baig did not know either Abreha or Maaref and did not drive for the Carriage Cab Company. Baig was able to describe defendant's gun as he was a gun owner "so I know what a real gun is," and he was clear that it was a semiautomatic rather than a revolver. When asked to describe a revolver, he said that it has a barrel but explained that "I'm bad at explaining those type of things." The cab ride had lasted about 10 minutes, and Baig had ample opportunity to look at defendant as they conversed, and the robbery had taken about 5 minutes when Baig was facing defendant much of the time. The robbery occurred at night but there was street lighting at the scene. Defendant was wearing a T-shirt that night, and Baig saw that he had tattoos on his arm or neck but could not recall what they were. About nine days after the incident, Baig viewed a photographic array from which he identified defendant as the robber.

¶ 15    On cross-examination, Baig testified that he was living with his parents at the time of the robbery and had given police his contact information when he reported the robbery that day. Baig told police about the cab video, and officers asked for the video but Baig declined for the reason stated earlier. However, Baig did not tell police that defendant ripped out the interior camera, and he did not know what happened to it after defendant ripped it out. Baig could not tell what the caliber of defendant's gun was, and defendant held the gun in his right hand during the robbery.

¶ 16    On redirect examination, Baig reiterated that he had no access to the cab video and the cab company tried to retrieve the video once Baig asked for it but then told him it was unrecoverable. On recross-examination, he added that he asked for the video a few months after the incident but to his knowledge the cab company kept video for only 30 days.

¶ 17    Detective Luis Carrizal testified that on September 6, 2015, he was investigating the Abreha robbery the previous day when, after interviewing Abreha, he requested the video from Abreha's cab from his cab company. He dealt there with Stryck, who provided him video and still images. However, she had provided him video and images from Maaref's cab from his

- 4 -

reported robbery on September 7. Detective Carrizal told Stryck of the error, and she provided the correct video and images. When Detective Carrizal viewed both videos, he realized the same suspect was in both, and photographic comparison led to defendant as the suspect. Detective Carrizal prepared an array of six photographs including defendant and had another detective show them to Abreha. When Abreha identified defendant as the robber, Detective Carrizal arrested defendant on September 9, 2015, near Chicago Avenue and Larrabee Street in Chicago. Defendant's postarrest search found a cell phone, which contained an image of Maaref, and Detective Carrizal's investigation found that it belonged to Maaref. Detective Carrizal provided the cell phone to the detective who was investigating Maaref's robbery, Detective Donald Falk. When defendant was photographed after his arrest, Detective Carrizal noted that he had tattoos including writing on his left forearm and a money bag on his left shoulder. Defendant's home was about a block north of Chicago Avenue on Lawndale Avenue in Chicago.

¶ 18    On cross-examination, Detective Carrizal testified that the video from Abreha's cab did not depict defendant holding a gun.

¶ 19    Detective Falk testified that he investigated the Maaref robbery, interviewing Maaref and receiving from Detective Carrizal a cell phone and videodisc. Detective Falk determined that the cell phone was Maaref's and concluded from his investigation that defendant was the suspected robber.

¶ 20    The State rested, and the court denied defendant's motion for a directed verdict, in which counsel argued primarily that there was no evidence, other than Baig's testimony that he saw a gun, that defendant had held or used a firearm for the armed robbery charges. The court noted than an object that looks like a gun and is used like a gun is reasonably inferred to be a gun.

¶ 21    Defendant chose not to testify, and the defense rested.

¶ 22    In the jury instruction conference, defendant sought an instruction on the definition of a firearm, offering two alternatives. One was:

> "The word 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas. The term 'firearm' does not include:
>
> (1) any pneumatic gun, spring gun, paint ball gun, or B-B gun which expels a single globular projectile.
>
> (1.1) any pneumatic gun, spring gun, paint ball gun, or B-B gun which expels breakable paint balls containing washable marking colors."

The second was the same except it omitted "(1.1)" and the phrase following it. The State offered an instruction consisting of only the first sentence. The court accepted the State's instruction and refused defendant's alternatives. Therefore, the court instructed the jury that a "firearm" is defined as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas." Illinois Pattern Jury Instructions, Criminal, No. 18.35G (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 18.35G).

¶ 23    During closing arguments, the prosecutor described the robberies of Abreha, Baig, and Maaref. She argued that the jury viewed the video from Maaref's robbery though he did not testify:

"The defendant is in the back of his cab. He pulls out a gun. [Maaref] hands a bag over to him. The defendant is still pointing a gun at [Maaref]. And eventually the defendant gets out. What you also see on that video is that it's on that same street where the defendant directed [Baig]. It's that dead end street on north Drake. You can clearly see that's it's the defendant in this video and that he is pointing a gun at [Maaref]. And you can see that [Maaref] hands him something, a bag, that's all happening inside of the cab and you can see on this bottom one that it's outside. It's that dead end of Drake Street."

After playing the video again, the prosecutor argued "You are going to come back over this way. You are going to die. The last thing that the defendant says to [Maaref]. You can see him in these videos. He is scared. He's got his hands up."

¶ 24 Regarding the elements of armed robbery against Maaref, the prosecutor argued "You see in the video [Maaref] hand over that bag to the defendant. And lo[ ] and behold two days later when the defendant gets arrested *** what does he have on him. [Maaref's] cell phone." She argued that defendant used force or the threat of force when he "threatens to shoot [Maaref] if he comes back. He says you come back, you are going to die as he is pointing the gun at [Maaref] while he is still inside of the cab." Lastly, regarding the firearm element, she argued "You see what the defendant has in his hand, and you see that it's a gun. You can see the terror in [Maaref's] face as all of this is taking place. And the defendant is threatening to shoot him. Right there. That's the gun."

¶ 25 Following closing arguments and instructions, the jury found defendant guilty of the armed robberies of Baig and Maaref but not guilty of the armed robbery of Abreha.

¶ 26 No posttrial motion was filed or argued. During the sentencing hearing, Maaref's written victim impact statement indicated that he was cripplingly afraid of leaving his home for fear of anyone he met trying to kill him, to the point where he could no longer work as a cab driver, was receiving antidepression and antianxiety medication and psychiatric treatment, and had been hospitalized for suicidal thoughts. Following evidence and arguments in aggravation and mitigation, the court sentenced defendant for armed robbery in case Nos. 15-CR-17608 and 15-CR-17609 to concurrent prison terms of 35 years. This appeal timely followed.

¶ 27                                         III. ANALYSIS

¶ 28 On appeal, defendant contends that the State (1) failed to prove him guilty beyond a reasonable doubt of robbing Maaref, (2) elicited inadmissible hearsay that Maaref's cell phone was recovered from defendant, (3) made improper argument that defendant threatened to kill Maaref, and (4) failed to prove beyond a reasonable doubt that defendant used a firearm as statutorily defined so that his offenses were not armed robbery but robbery. Lastly, he contends that the trial court erred by not properly instructing the jury on the statutory definition of a firearm.

¶ 29                                      A. Hearsay Evidence

¶ 30 We shall first address defendant's second contention: that the State elicited inadmissible hearsay that Maaref's cell phone was recovered from defendant. The State responds that this contention was forfeited, the evidence was properly admitted to show the course of the police investigation, and the State argued reasonable inferences from the evidence.

¶ 31      As a threshold matter, defendant did not challenge, either with an objection at trial or in a posttrial motion, the testimony of Detectives Carrizal and Falk that they determined the cell phone found in defendant's possession on his arrest to be Maaref's cell phone. He has therefore forfeited the claim as the State argues. A defendant preserves an issue for appeal by objecting at trial and raising the issue in his or her posttrial motion. *People v. Jackson*, 2020 IL 124112, ¶ 81. Forfeiture, or failure to preserve an issue, is important because a timely objection allows the trial court to promptly correct error, while the failure to object at trial to the admission of evidence deprives the State of the opportunity to cure any error. *People v. Wilson*, 2017 IL App (1st) 143183, ¶ 22.

¶ 32      Forfeiture can be overcome by a plain error analysis, whereby an otherwise-forfeited clear or obvious error is considered if the trial evidence was so closely balanced that the error alone threatened to tip the scales of justice or if the error was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. *Jackson*, 2020 IL 124112, ¶ 81. The defendant bears the burden of showing plain error, and the first step in plain error analysis is determining whether there was error. *Id.* Forfeiture is also set aside when a defendant contends that trial counsel was ineffective for not preserving the error. *Id.* ¶ 90. Such a claim requires that counsel have made an objectively unreasonable decision that prejudiced the defendant. *Id.*

¶ 33      Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and for this purpose a statement "is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Ill. R. Evid. 801(a), (c) (eff. Oct. 15, 2015). The addressing of mail to a defendant at given premises is not hearsay, so that a defendant may properly be linked to the premises by such mail because the addressing of mail is not an intentional assertion offered for the proof of the matter asserted under Rule 801. *People v. Neal*, 2020 IL App (4th) 170869, ¶ 142. In other words, the content of mail may consist of intentional assertions, but the mail is not being offered for the truth of those assertions but of the addressing. *Id.* ¶¶ 135-38. We review the admission of evidence for an abuse of discretion, finding such only if the trial court's ruling was so arbitrary, fanciful, or unreasonable that no reasonable person would agree with it. *People v. King*, 2020 IL 123926, ¶ 35.

¶ 34      The Illinois Rules of Evidence also address authentication and witness opinions. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ill. R. Evid. 901(a) (eff. Sept. 17, 2019). When a

> "witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness'[s] testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." Ill. R. Evid. 701 (eff. Jan. 1, 2011).

¶ 35      Here, defendant argues that the detectives' "testimony could not have come from personal knowledge" but were "an out of court statement offered for the truth of the matter asserted." Each detective testified that he determined the cell phone to be Maaref's, and Detective Carrizal added that it contained Maaref's photograph or image. Defendant is correct that this testimony was used for the truth of the matter asserted by the detectives, rather than merely to

- 7 -

show the course of the investigation, in that the State argued that defendant's possession of Maaref's cell phone upon his arrest corroborated the cab video depicting an apparent armed robbery.

¶ 36    However, we disagree with defendant that the detectives' testimony was to an out-of-court statement. It may be that Maaref identified the cell phone at issue as his, which would be hearsay because Maaref did not testify—had either detective testified that his determination relied upon such a statement. However, neither detective testified that Maaref made such a statement, much less that he based his determination on such a statement. Moreover, the trial evidence shows that at least Detective Carrizal examined the contents of the cell phone for himself, rather than relying on such a statement, as he testified to seeing a picture of Maaref on the cell phone. Defendant argues that the detectives "claimed they learned the phone was Maaref's because they found pictures of him on the phone, but they did not testify as to how they knew the pictures were of Maaref." However, Detective Falk testified that he interviewed Maaref.

¶ 37    The detectives may well have seen for themselves additional indications in the cell phone that it was Maaref's, but as defendant did not object to their testimony, the State was deprived of the opportunity to explore that point to resolve any concerns about the admissibility of the testimony. Moreover, while defendant argues that the prospect the detectives "viewed some kind of documentation confirming the phone was Maaref's" involves hearsay, *Neal* shows otherwise. Just as linking a defendant to certain premises by mail does not involve hearsay because the addressing of mail is not hearsay, we find that linking a cell phone to its owner by the addressing of text messages, e-mails, or the like therein would not be hearsay because the State would not be using the messages for the truth of their intentionally asserted content but of the addressing or direction of the messages; in this case, to or from Maaref.

¶ 38    We find that the testimony at issue was not improperly admitted hearsay as there was no evidence it relied upon an out-of-court statement by a declarant other than the detectives offered for the truth of the matter asserted. We also find that the detectives offered opinions on whose cell phone defendant possessed that were rationally based on their perceptions, helpful to the determination of a fact at issue, and not apparently based on scientific, technical, or other specialized knowledge. In sum, we find that the trial court did not err in admitting the testimony at issue. Finding no error on this contention, we find no plain error or ineffectiveness of counsel.

¶ 39                                    B. Maaref Robbery

¶ 40    Defendant contends that the evidence was insufficient to convict him of the robbery of Maaref, in particular that there was no testimony that Maaref was robbed. The State responds that the circumstantial evidence, including the video from Maaref's taxi and defendant's possession of Maaref's cell phone, is sufficient to convict defendant of robbing Maaref.

¶ 41    When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Jackson*, 2020 IL 124112, ¶ 64. We do not retry a defendant because it is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from the testimony and other evidence. *Id.* The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's

guilt. *Id.* ¶ 70. The trier of fact is not required to disregard inferences that flow normally from the evidence nor to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Id.* A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Id.* ¶ 64.

¶ 42  Here, taking the evidence in the light most favorable to the State as we must, we find that a reasonable trier of fact could find defendant guilty of robbing Maaref. While Maaref did not testify, a video from his cab was shown at trial, in that Stryck testified firmly that she obtained video and images in question from Maaref's cab and that the video and images shown at trial were the ones she obtained. The jury could see for itself that defendant pointed an apparent gun at Maaref, who raised his hands and quickly passed a bag back to defendant. The jury could also hear for itself defendant uttering a threat to kill Maaref if he returned and heard Maaref immediately reply "OK." Defendant argues that "there was no evidence presented to suggest what was passed between Maaref and [defendant] or who passed and who received that item." However, the video clearly shows Maaref passing a bag backward to defendant. Moreover, it can be reasonably inferred from the evidence that defendant was found in possession of Maaref's cell phone upon his arrest that defendant took at least Maaref's cell phone.

¶ 43                                    C. Improper Argument

¶ 44  Defendant also contends that the State made an improper argument that he threatened to kill Maaref when Maaref did not so testify. The State responds that the argument was properly grounded in evidence and reasonable inferences therefrom, in particular the video from Maaref's taxi in which defendant can be heard threatening Maaref.

¶ 45  As a threshold matter, defendant again did not object either at trial or in a posttrial motion to the State's remark at issue and has therefore forfeited this claim, which we may set aside for plain error or ineffective assistance of trial counsel. *Id.* ¶¶ 81, 90-91.

¶ 46  Generally, prosecutors have wide latitude in the content of their closing arguments and may comment on the evidence and any fair and reasonable inference that may arise from the evidence even if the suggested inference reflects negatively on the defendant. *Id.* ¶ 82. A reviewing court considers the closing argument as a whole rather than focusing on selected phrases or remarks. *Id.* The standard of review applied to a prosecutor's closing argument is similar to the standard for deciding whether a prosecutor committed plain error, whereby reversible error is found only if the defendant demonstrates that the remarks were both improper and so prejudicial that real justice was denied or the verdict resulted from the error. *Id.* ¶ 83.

¶ 47  Here, we agree with the State that the argument at question was not improper because it was duly based on evidence and reasonable inferences from evidence. We therefore find no plain error or ineffectiveness of counsel on this contention. In particular, a voice can be heard on the video from Maaref's cab saying, "You come back over this way, you gonna [*sic*] die, alright?" and another male voice immediately replies "OK." We disagree with defendant that it "is unclear as to who is speaking on the video as the words are spoken after the passenger exited the vehicle. It could have just as easily been Maaref threatening the passenger as he left the vehicle." More precisely, we reject the contention that the possibility the threat was made by Maaref rather than defendant renders the State's argument that defendant said it an unreasonable inference, much less mere speculation. We similarly disagree with defendant's

- 9 -

argument that "looking at the driver's face in the surveillance video, there is no clear showing of fear or terror, and only Maaref could have testified to what he was thinking and feeling." The jury could assess for itself Maaref's face and assess that his flinching, raising of his hands, quick passing of the bag, and immediate compliant and breathless reply to defendant's threat support an inference that Maaref was scared or intimidated by defendant pointing an apparent gun at him.

¶ 48                             D. Firearm for Armed Robbery

¶ 49      Defendant contends that the State failed to prove either count of armed robbery because it failed to prove that he possessed or used a firearm as statutorily defined. The State responds that there was sufficient evidence to find him guilty of both counts of armed robbery.

¶ 50      Armed robbery with a firearm is a Class X felony punishable by 21 to 45 years' imprisonment. 720 ILCS 5/18-2(a)(2), (b) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). Robbery is a Class 2 felony punishable by three to seven years' imprisonment. 720 ILCS 5/18-1(c) (West 2018); 730 ILCS 5/5-4.5-35(a) (West 2018). A firearm is defined for purposes of armed robbery as it is defined in the Firearm Owners Identification Card Act (FOID Act), which is "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas" and not falling under a list of exceptions. 430 ILCS 65/1.1 (West 2018); see 720 ILCS 5/2-7.5 (West 2018).

¶ 51      Our supreme court has held that a defendant's possession of a firearm may be proven by eyewitness testimony or other evidence from which a trier of fact can reasonably infer that the object used in an alleged armed robbery with a firearm was a firearm as defined by the FOID Act. *People v. McLaurin*, 2020 IL 124563, ¶¶ 24, 29, 31 (citing *People v. Washington*, 2012 IL 107993, and *People v. Wright*, 2017 IL 119561). In other words, whether a defendant possessed a firearm is evaluated by the same test as all other issues of sufficiency of the evidence: whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* ¶¶ 32, 35.

¶ 52      As this court has stated, in light of *McLaurin*:

> "To prove beyond a reasonable doubt that a defendant was armed with a firearm, the State generally does not need to offer direct evidence of the alleged firearm's 'design' or its precise method of expelling projectiles, as defendant would have us require. And a single witness, with no training, experience, or knowledge of firearms, is enough. The witness need not provide any meaningful description of the gun. Nor, for that matter, does any witness need to see the whole gun, much less see it for more than a brief moment or from a favorable vantage point." *People v. Joseph*, 2021 IL App (1st) 170741, ¶ 63.

Also, a "defendant's threat to shoot a victim is circumstantial evidence that he was armed with a firearm." *Id.* ¶ 71.

> "True, defendant could have been faking it, so to speak—threatening to shoot her with something that was not actually a firearm but rather an air gun or similar dangerous weapon that does not qualify as a firearm. But that is not its most natural and ordinary meaning, nor is it the interpretation most favorable to the State." *Id.* ¶ 72.

¶ 53        Here, Baig testified that defendant pulled out a gun and demanded his property, threatening to shoot and kill Baig if he did not. As a result, Baig put his hands up, begged defendant not to kill him, and gave him over $300. Baig described defendant's gun as a two-toned or black and silver semiautomatic pistol at Baig. While Baig had some difficulty explaining what a revolver was, he testified that revolvers have a barrel and was firm that defendant's gun was a semiautomatic. Given Baig's testimony that he was a gun owner and knew "what a real gun is," it is reasonable to infer that his inability to describe a revolver was not a sign of his unfamiliarity with guns but, as he testified, of his difficulty expressing his knowledge.

¶ 54        As to Maaref, the video showed defendant pointing at Maaref an apparent two-toned semiautomatic gun as Baig testified. As with Baig, defendant quickly raised his hands and gave defendant his property. As with Baig, defendant made a death threat. We see no reason to find this evidence insufficient merely because Maaref did not testify when the jury could see and hear for itself circumstances sufficient to determine whether defendant used a firearm in robbing Maaref.

¶ 55        We find the evidence that defendant used a firearm in robbing Baig and Maaref was not so unreasonable, improbable, or unsatisfactory that a reasonable doubt of defendant's guilty of two counts of armed robbery remains.

¶ 56                                    E. Firearm Jury Instruction

¶ 57        Lastly, defendant contends that the trial court erred by refusing to properly instruct the jury on the statutory definition of a firearm as he requested. The State responds that the court did not err by not giving the requested instruction.

¶ 58        As a threshold matter, defendant has again forfeited this claim. While he offered his desired instructions at trial, he did not challenge the denial of those instructions in a posttrial motion. *People v. Austin*, 2017 IL App (1st) 142737, ¶ 46 (a defendant forfeits a claim of jury instruction error unless he or she objected to the instruction or offered an alternative instruction and raised the instruction issue in a posttrial motion). As described above, we may set aside forfeiture for plain error or ineffective assistance of trial counsel. *Jackson*, 2020 IL 124112, ¶¶ 81, 90.

¶ 59        As stated above, "firearm" is defined for purposes of the Criminal Code of 2012 as it is in the FOID Act. 720 ILCS 5/2-7.5 (West 2018) (citing 430 ILCS 65/1.1 (West 2018)). The FOID Act defines a firearm as:

> "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas; excluding, however:
>
>> (1) any pneumatic gun, spring gun, paint ball gun, or B-B gun which expels a single globular projectile not exceeding .18 inch in diameter or which has a maximum muzzle velocity of less than 700 feet per second;
>>
>> (1.1) any pneumatic gun, spring gun, paint ball gun, or B-B gun which expels breakable paint balls containing washable marking colors;
>>
>> (2) any device used exclusively for signaling or safety and required or recommended by the United States Coast Guard or the Interstate Commerce Commission;

(3) any device used exclusively for the firing of stud cartridges, explosive rivets or similar industrial ammunition; and

(4) an antique firearm (other than a machine-gun) which, although designed as a weapon, the Department of State Police finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 430 ILCS 65/1.1 (West 2018).

¶ 60    The function of jury instructions is to convey to the jury the correct principles of law applicable to the trial evidence so that, having determined the facts from the evidence, the jury may apply the proper legal principles to arrive at a correct conclusion according to the law and the evidence. *People v. Nere*, 2018 IL 122566, ¶ 29. Whether the trial court erred in refusing a particular jury instruction is reviewed for abuse of discretion, while we review *de novo* whether a particular jury instruction accurately conveyed the law applicable to the case. *Id.*

¶ 61    IPI Criminal No. 18.35G provides that "[t]he word 'firearm' means any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas, or escape of gas. [The term does not include ____.]" The Committee Note to IPI Criminal No. 18.35G provides that the court should "[i]nsert in the blank the name or description of any gun or device excluded from the definition by subsections (1), (2), (3), or (4) of Section 65/1.1" but also that the court should "[u]se bracketed material when appropriate." IPI Criminal No. 18.35G, Committee Note.

¶ 62    A defendant is entitled to an instruction on his or her theory of the case if some foundation for the instruction has been introduced in evidence. *Austin*, 2017 IL App (1st) 142737, ¶ 45. This is often referred to as the " 'slight evidence' " test. *Id.* ¶ 44. In *Austin*, two witnesses, namely:

"Stephenson testified that she could not tell the difference between a pellet gun and other guns, and Younger admitted that he did not know if the gun was real or a pellet gun and that what he saw could have been a toy. Based on these answers, Austin claims he was deprived of his right for the jury to be instructed on the law that applied to the evidence in his case. He contends the trial court should have included in the definition of firearm specific items that do not meet the definition but which may appear, superficially, to be firearms." *Id.* ¶ 49.

Noting that IPI Criminal No. 18.35G provides that the exclusions should be included in the instruction " 'when appropriate' " (*id.* ¶ 50 (quoting Illinois Pattern Jury Instructions, Criminal, No. 18.35G (4th ed. 2000))), this court rejected the aforesaid contention and the related claim "that the instruction as given was misleading on the key issue of identification of the weapon" (*id.* ¶ 44).

¶ 63    Here, the court gave the jury the unbracketed version of IPI Criminal No. 18.35G, which replicates the relevant statute except for the enumerated exclusions from the definition of a firearm, and declined to give the first two exclusions as requested by defendant. As the *Austin* court did, we consider it significant that the pattern instruction provides that the exclusions should be included in the instruction "when appropriate." IPI Criminal No. 18.35G. While there has been argument in the trial court and here concerning BB or pellet guns, toy guns, and the like, there was certainly less *evidence* of such an object in this trial than that found insufficient for a similar instruction in *Austin*, and certainly no more evidence for the statutory exclusions defendant sought to include than for any of the other exclusions he did not seek. Indeed, we find that there was not even the slightest trial evidence that the object held by

defendant fell under either of the exclusions he sought to include in the instructions. We conclude that the court's firearm definition instruction did not misstate the law or mislead the jury and that the court did not err in denying defendant's requested instructions. Having found no error, we also find no plain error or ineffectiveness.

IV. CONCLUSION

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.