NOTICE

Decision filed 10/24/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230283-U

NO. 5-23-0283

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* AMARION S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | St. Clair County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JD-218 |
| | ) | |
| Amarion S., | ) | Honorable |
| | ) | Elaine L. LeChien, |
| Respondent-Appellant). | ) | Judge, presiding. |

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm that portion of the circuit court's adjudication of delinquency regarding aggravated unlawful use of weapons and aggravated assault where sufficient evidence was presented to demonstrate that the respondent possessed a firearm and vacate that portion of the circuit court's adjudication of delinquency regarding disorderly conduct pursuant to the one-act, one-crime rule.

¶ 2    On December 29, 2022, the State filed a petition to adjudicate the respondent, Amarion S., a delinquent minor under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)). The State alleged, in three separate counts, that the respondent had violated the Criminal Code of 2012 (Code) (720 ILCS 5/1-1 *et seq.* (West 2022). On March 8, 2023, the circuit court entered an order finding the defendant guilty of all three counts, and on March 29, 2023, the circuit court entered a *nunc pro tunc* order, finding the respondent guilty beyond a reasonable doubt of

1

count 1, aggravated unlawful use of weapons, count 2, aggravated assault, and count 3, disorderly conduct. On March 30, 2023, the circuit court entered an order finding that the respondent was a delinquent minor and adjudicating the minor a ward of the court. The circuit court sentenced the respondent to serve 30 days of detention, with credit for 30 days of time served.

¶ 3    The respondent appeals, arguing that the State failed to present sufficient evidence of aggravated unlawful use of weapons (AUUW) and aggravated assault, where the evidence was insufficient to show that he possessed a firearm. Further, the respondent argues that the respondent's adjudication for disorderly conduct should be vacated pursuant to the one-act, one-crime rule. For the following reasons, we affirm the judgment of the circuit court of St. Clair County, adjudicating the minor delinquent and making him a ward of the court, where the evidence was sufficient to prove that the minor was guilty, beyond a reasonable doubt, of AUUW and aggravated assault. We vacate the respondent's adjudication for disorderly conduct pursuant to the one-act, one-crime rule.

¶ 4                                    I. BACKGROUND

¶ 5    On December 29, 2022, the State filed a petition alleging that the respondent was a delinquent minor. In count 1, the State alleged that the respondent committed AUUW in violation of section 24-1.6(a)(1), (a)(3)(I) of the Code (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2022)), by knowingly carrying, in a fixed place of business, a black handgun with an extended magazine, at a time when the respondent was not on his own land, not in his own abode or fixed place of business, and was under 21 years of age in possession of a handgun. Count 2 of the petition alleged that the respondent committed aggravated assault in violation of section 12-2(c)(1) of the Code (*id.* § 12-2(c)(1)), by committing an assault in violation of section 12-1(a) of the Code (*id.* § 12-1(a)). The State alleged that, while using a deadly weapon, the respondent knowingly brandished a handgun at Brandon Miller and placed Miller in reasonable apprehension of receiving a battery.

2

Finally, count 3 of the petitions alleged that the respondent committed disorderly conduct in violation of section 26-1(a)(1) of the Code (*id.* § 26-1(a)(1)), by knowingly brandishing a handgun in such an unreasonable manner as to alarm or disturb Miller and provoke a breach of the peace.

¶ 6    The adjudicatory hearing began on January 26, 2023. The State called Antonia Cordova as its first witness. Cordova testified that she was the store manager at the retail store of Forever 21. Cordova employed Brandon Miller, who began working at the store on December 27, 2022. Cordova and Miller were both working on December 28, 2022. At around 1:45 p.m. on that day, Cordova had walked into the back employee area to sit down at the desk and work on the schedule for the next week. About a minute after she sat down, Miller ran into the back very flustered and said that somebody had pulled a handgun on him while he was working on the sales floor. Miller was staring down at the ground, his hands were shaking, and he "just like fell into the chair next to me." Cordova testified that she then went to try to get a description to call security and the police. When she walked onto the sales floor, there was a group of people, three females and one male, huddled by a pillar near the cash registers near the entrance to the store. As there was only one male in the store, Cordova assumed that the male was the individual that Miller had said had pulled a handgun on him. The male was making eye contact with Cordova when she came out of the door. The male appeared to be African American, average height, and skinny. He was wearing a green hoodie and sneakers, and had his hood pulled up and a mask partially pulled up on his face. Cordova was able to see the male's face above the mouth. Cordova testified that the group the male was with were laughing. She walked over to another manager closer to the group in an attempt to get a description and indicated to the other manager that they would need to call security. One of the females in the group had really long braids in her hair that were brightly colored, red and pink.

3

¶ 7 When Cordova walked toward the front of the store, the group almost immediately walked out of the store. Cordova then went back and called security and the police department. Cordova testified that Forever 21 had 16 cameras recording at all times. She was able to access the footage a few minutes after the group had left the store. The State introduced People's Exhibit 1, a disc copy of the closed circuit television footage (CCTV) from that day, into evidence.

¶ 8 The surveillance footage clearly depicts a young man in a green hoodie remove what appears to be a black handgun with an extended magazine out of his pants and then move out of the frame. A young man in a gray outfit then comes into frame, being pursued by the young man in the green hoodie. Once the young man in the gray outfit disappears into the back of the store, the young man in the green hoodie pulls a mask over his mouth, pulls his hoodie over his head, and faces the door where the young man in the gray outfit had gone. When a woman comes out of the same door, the young man in the green hoodie leaves the frame.

¶ 9 Cordova testified that the individual that she made eye contact with when exiting the back room was depicted on the surveillance footage wearing a green hooded sweatshirt. She also testified that the young man seen running toward the back of the store in a gray outfit was Miller. Cordova testified that she was also depicted on the surveillance footage walking out of the back area of the store. Cordova further testified that she did not ever see a firearm in the store that day and never saw the respondent again. Cordova did see the woman with the braids walk past the store with the green hoodie that she saw the respondent wearing earlier that day. The woman was seen outside of Forever 21 approximately 10 to 15 minutes after the group had left.

¶ 10 Cordova did not see the defendant with a firearm in the store but saw one when reviewing the surveillance footage. Cordova testified that in the video, the object the respondent was holding looked like a handgun with an extended magazine on it. She was not able to tell if it was operational and admitted that she did not know for certain that it was, in fact, an actual firearm. Cordova

4

testified that she based her assessment that the object was a firearm on the shape, and the fact that the respondent pulled it out of his pants and pointed it at somebody. Cordova testified that, even without the indication from Miller, she would have thought the object from the surveillance footage was a firearm. Cordova stated, "I mean I don't know a ton about guns so I couldn't tell you like the exact kind of gun it is. I don't—I'm not really sure." Cordova testified that the respondent can be seen on the video pulling the object out of his pants, his waistband, that it was shaped like a handgun, and that the respondent held it like a handgun.

¶ 11    Next, the State called Brandon Miller. Miller testified that he was 18 years old and worked at Forever 21 as a sales associate. Miller went into work on December 28, 2022, at around noon. At approximately 1:45 p.m., Miller looked up from where he was placing clothes on the sales floor and a male wearing a green jacket and black pants walked up to Miller. Initially, Miller thought the male needed help with something; however, the male pulled out a black handgun with an extended magazine on it. Miller had not met the respondent before and did not recognize him from anywhere. He testified that he did not get a good look at the man's face. Miller testified that the man spoke and "he was like I said something about his dad or something. And I was like I don't even know you." Miller testified that when he saw the handgun, he panicked and went straight to the back room. Miller described the handgun as black with an extended magazine on it. When he saw the handgun from approximately a foot away, he believed it was a real handgun. Miller believed that he was in danger and that the respondent may shoot. Miller stated that had been shot before, and seeing the handgun triggered his post-traumatic stress disorder. Miller testified that he had played with several types of toy handguns before, and that there was nothing about the handgun that made it look like a toy. The handgun did not have the distinct colors of a toy handgun, as it was made of metal. Miller testified that after he walked to the back of the store, he did not see the person with the handgun again that day. The State then played portions of its video exhibit and

5

asked Miller to comment on portions therein. Miller identified himself on the video as the person wearing all gray. Miller testified that he did not say anything to the respondent that day, other than asking him if he needed help. That is when the respondent pulled out the handgun while looking directly at Miller.

¶ 12    On cross-examination, Miller testified that after the incident and in the days following, he did not message or reach out to anybody. On redirect examination, Miller testified that it was possible that he said something to the respondent and did not recall but stated that he did not believe he said anything threatening. He testified that he went straight to the back office of the store and told his manager upon seeing the handgun.

¶ 13    Next, the State called Zyhakia Evans. Evans testified that she was 18 years old and in high school. Evans testified that the respondent formerly went to her school, where they met, and they reconnected through a phone application called Facebook Messenger. She identified the respondent in the courtroom and testified that she saw him on December 28, 2022. That afternoon, Evans was with her sister and her best friend at the mall. She had been talking with the respondent on Facebook Messenger that day and he had met up with her at the mall at around 1:30 p.m. Evans testified that after meeting up with the respondent, they walked around a bit and then went inside the Forever 21 store. Evans was shopping for her birthday outfit, and she was not sure what time the group was in Forever 21.

¶ 14    While in Forever 21, the respondent approached a young man that was working in the store. The respondent was aggressively yelling at the worker. Evans said that the respondent yelled at the worker, " 'what happened the last time—remember last time I told you I was going to see you,' or something like that." The respondent was moving angrily, like he was rushing toward the person. Evans could not see what the respondent was doing with his hands as she was behind him, standing with her sister and best friend. Evans never saw the worker say anything but saw him

6

backing away from the respondent and then running to the back to the employees only part of the store. The respondent walked toward the employees only door, put his ski mask on, and just stood there for a while waiting to see if Miller was going to come out. After a few minutes, the manager came out and talked to a worker on the floor. At that point, the group left the store.

¶ 15    After leaving the store, Evans and the respondent went to Macy's, and her friend and sister went to another store. Evans was not aware of the respondent having a handgun with him when they met up but found out later that he did. Evans testified that after leaving the store, the respondent was angry and called someone. When the respondent was talking on the phone, he said that he had found where the worker had worked and was angry and yelling at whomever he was on the phone with. Evans testified that she and the respondent switched jackets because they saw police coming downstairs and she was afraid that the police would identify them. Evans put on the respondent's green hoodie, and the respondent put on Evans's black jacket. After switching jackets, she and the respondent tried to leave the mall as quickly as possible. They went to the store where her friend and sister had been, then she and the respondent left the mall through the Macy's entrance. At that point, the two walked to Cheddar's restaurant. Evans stated that they wanted to leave the mall in case the worker was going to come looking for the respondent. Evans was worried about her safety and that of her sister and friend. She and the respondent went into Cheddar's and sat at a booth. At that point, the respondent was on the phone again trying to get someone to come pick him up. She testified that she heard him say on the phone that he had a handgun. Evans also testified that the way the respondent was sitting, and his posture indicated that he had a handgun. After the phone call, someone came and picked the respondent up from Cheddar's and he left. Evans then went back to the mall and was eventually detained inside another store.

7

¶ 16    The State played the video exhibit for Evans, and she identified herself and the respondent in the surveillance footage. Evans testified that the individual in the gray outfit running toward the back was the worker that she saw and testified about, and the respondent was in the surveillance footage wearing a green hoodie. At that point in the footage, the respondent had on the mask that she had described in her testimony; however, she testified that the respondent did not have the mask on when they walked into the store. Evans testified that the way the respondent was acting seemed angry and that he was trying to make the worker in the store really scared of him.

¶ 17    On cross-examination, Evans testified that the worker may have said a few words to the respondent, but looked scared and was backing away a lot. When the respondent and Evans switched jackets, she did not see a handgun. While she did not see a firearm at Cheddar's, Evans believed that the respondent had one based on the way that he was sitting. Evans further clarified that she overheard the respondent on the phone saying that he had to go and could not be there because he was carrying "something." The respondent never used the words "gun," "firearm," or anything similar on the phone. When Evans heard the respondent say that he was carrying something, she believed that it was a firearm based on the way that he had interacted with the person inside of the mall and the way he was sitting in Cheddar's.

¶ 18    The State next called Detective Sergeant Aaron Nyman. Detective Nyman testified that he was employed with the Fairview Heights Police Department for approximately 18 years. Detective Nyman was working on December 28, 2022, and assisted in the investigation of the incident at the Forever 21 store. Detective Nyman took the respondent into custody at his home that day. Detective Nyman had spoken to a family member of the respondent that told him the respondent had run out of the door when his mother told him the police were coming. When Detective Nyman arrived at the respondent's home several minutes later, the respondent appeared sweaty, even though it was winter. The respondent's mother gave Detective Nyman consent to search the house

8

for a handgun. The search recovered a BB gun. Officers searched outside of the respondent's house with a K-9 team and walked the neighborhood trying to find a handgun. No handgun was recovered.

¶ 19    The State did not present any other witnesses; however, a stipulation was presented by the parties stipulating to the respondent's age being 17 years old and that he was born on September 5, 2005. The respondent made a motion for a directed verdict, which was denied.

¶ 20    The respondent then called Brandon Miller to testify. Defense counsel asked Miller again if he had ever had any contact with the respondent before the Forever 21 incident. Miller responded that they used to play basketball together about two years prior to the incident, but that he did not really know the respondent because they played for different teams. Counsel then asked about text messages or interactions in any messaging application that Miller may have had with the respondent. Miller testified that his Instagram account was run by other people, and that the Instagram account that was messaging the respondent was Miller's, but that he was not the person sending messages. However, there were messages about Miller's recovery from a prior shooting that were sent to the respondent from Miller's account from July through November. Miller testified that during that time, he did not have access to any devices, so anything posted on his Instagram account or text messages sent to the respondent would not be Miller's words. Miller listed about five people that have his passwords and "run his account." Miller testified that he does not use that account at all, and that he has a different account.

¶ 21    The defense rested and both parties gave closing arguments. At the close of arguments, the circuit court took the matter under advisement. On March 8, 2023, the circuit court entered an order finding the defendant guilty of all three counts, and on March 29, 2023, the circuit court entered a *nunc pro tunc* order, finding the respondent guilty beyond a reasonable doubt of aggravated unlawful use of a weapon, aggravated assault, and disorderly conduct. On March 30,

9

2023, the circuit court entered an order finding that the respondent was a delinquent minor and adjudicating the minor a ward of the court. The circuit court entered a sentencing order, by agreement of the parties, requiring the respondent to serve 30 days in detention, with credit for 30 days of time served. The respondent filed a timely notice of appeal on April 20, 2023.

¶ 22                                    II. ANALYSIS

¶ 23    Before proceeding with our analysis of this matter, we first address the timeliness of our decision. The matter at bar is subject to an expedited disposition pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Rule 311(a)(5) requires us to issue our decision within 150 days after the filing of the notice of appeal, except where good cause is shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). The circuit court's final judgment was entered on March 30, 2023, and the respondent filed a notice of appeal on April 30, 2023. As such, this court was required to issue our decision by September 27, 2023, unless good cause is shown. The full record on appeal in this case was filed on June 29, 2023. The respondent/appellant then filed three motions for extension of time to file his initial brief, which were granted by this court. As such, the respondent/appellant's initial brief was not filed until September 8, 2023, resulting in the State/appellee's brief being filed on October 5, 2023. Therefore, this matter was not fully briefed until after the deposition due date had expired. Under these circumstances, we find good cause for issuing our decision after the 150-day deadline contemplated by Rule 311(a)(5).

¶ 24                          A. Sufficiency of the Evidence

¶ 25    Turning to the merits, the respondent argues on appeal that the State failed to prove that he was guilty of AUUW (count 1), because there was no reliable proof that the black object seen in his hand was an actual firearm. Count 1 required the State to prove that the respondent was in possession of a handgun. See 720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2022). A "handgun," as used in the AUUW statute, is defined as "any device which is designed to expel a projectile or

10

projectiles by the action of an explosion, expansion of gas, or escape of gas that is designed to be held and fired by the use of a single hand." 430 ILCS 66/5 (West 2022). The definition of "handgun," as used in the AUUW statute, includes exceptions for items such as BB guns, spring guns, paint ball guns, stun guns, among other exceptions. *Id.* The respondent also argues that the State failed to prove him guilty of aggravated assault with a deadly weapon (count 2), where the State did not prove beyond a reasonable doubt that the respondent possessed a firearm.

¶ 26    The respondent's argument is centered on the theory that the State failed to present sufficient evidence that the object carried by the respondent met the statutory definition of a handgun, and therefore, requests this court to reverse the respondent's adjudications for counts 1 and 2. The respondent argues that the object depicted in the video evidence presented by the State, although shaped like a firearm, could have been a BB gun that was subsequently found at the respondent's home, or some other object that merely resembled a firearm.

¶ 27    The State argues that the evidence was sufficient to prove that the object in the respondent's hand was a firearm and, in support, relies on the surveillance footage and the testimony of Cordova, Miller, Evans, and Detective Nyman. We agree with the State.

¶ 28    When reviewing a challenge to the sufficiency of the evidence, the applicable standard of review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the statutory elements of the offenses were proven beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002). This standard of review recognizes the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *People v. McLaurin*, 2020 IL 124563, ¶ 22. In performing our review, we will not retry the defendant, nor will we substitute our judgment for that of the trier of fact. *Id.* "A conviction will not be set aside on appeal

11

unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 29 Whether a defendant possessed a firearm during the commission of an offense is a question of fact for the trier of fact. *People v. Clark*, 2015 IL App (3d) 140036, ¶ 24. The State does not need to present an actual firearm in order for the trier of fact to find that the defendant possessed one. *People v. Washington*, 2012 IL 107993, ¶ 36. The trier of fact may reasonably infer that an object meets the statutory definition of a firearm even if the eyewitness who describes seeing a defendant holding a handgun does not provide a detailed description of the handgun or explain why the object meets the statutory definition of a firearm. *McLaurin*, 2020 IL 124563, ¶¶ 35, 38. Video evidence of a respondent with a handgun may be sufficient to prove a respondent had a firearm, even without eyewitness testimony. *People v. Collins*, 2021 IL App (1st) 180768, ¶ 54. Further, the use of a firearm can be proven by the testimony of a single witness; however, that testimony must provide sufficient facts to allow one to objectively conclude that the object used meets the statutory definition of a firearm. *People v. Clifton¸* 2019 IL App (1st) 151967, ¶ 33.

¶ 30 The respondent relies on language from *People v. Crowder*, 323 Ill. App. 3d 710, 712 (2001), in which the court observed that "an object that looks like a gun may actually be a toy or realistic replica." However, *Crowder* is readily distinguishable from the case at bar. The only issue on appeal in *Crowder* was whether the trial court properly dismissed the indictment, where the State destroyed the handgun that formed the basis of the charges after the defendant requested to view it. *Id.* at 711-12. Unlike *Crowder*, this case does not involve the destruction of a firearm sought by a defendant in discovery. The question here is entirely one of proof, that is, was the evidence presented at trial sufficient for a rational trier of fact to find beyond a reasonable doubt that the respondent possessed a firearm in Forever 21.

12

¶ 31    The mere possibility that the weapon observed was a toy or an object excepted from the statutory definition of "firearm" does not, alone, create reasonable doubt. *People v. Moore*, 2023 IL App (1st) 211421, ¶ 90; see also *People v. Joseph*, 2021 IL App (1st) 170741, ¶ 73 (finding that the possibility that the offender used a toy gun did not rise to the level of reasonable doubt). "The jury need not disregard inferences that naturally flow from the evidence or accept all possible explanations consistent with defendant's innocence and elevate them to the status of reasonable doubt." *Moore*, 2023 IL App (1st) 211421, ¶ 90 (citing *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228-29 (2009)).

¶ 32    In the present case, the State introduced surveillance footage, which showed the respondent entering a Forever 21 store and brandishing a black, handgun-shaped object that appeared to have an extended magazine, which he was holding like a handgun. At trial, Miller testified that the respondent walked up to him and pulled "it out." Miller testified that he had experience with handguns, having been shot before and having previously seen and played with different types of toy guns. Miller testified that all of the toy guns he had seen had distinctive colors on them, instead of built-in screws like real handguns. Miller described the object held by the respondent as a black handgun with an extended magazine and that the handgun was made of metal. Miller was face-to-face with the respondent when he made the observations of the handgun and testified that nothing about it made it look like a toy.

¶ 33    Cordova, the store manager, viewed the surveillance footage and believed that the object was shaped like a firearm with an extended magazine. Evans testified that she met the respondent in the mall. Shortly after the incident, she switched jackets with the respondent because the police were coming, and they wanted to leave the mall as quickly as possible. The two left and sat in a booth in Cheddar's, where the way the respondent sat and an overheard phone conversation, where the respondent stated that he was "carrying something," made Evans believe that the respondent

13

had a handgun on him. Finally, Detective Nyman testified that he searched the respondent's house; however, he subsequently discovered that the respondent had previously ran away when he heard that the police were coming.

¶ 34    Additionally, the respondent behaved, after the incident, in a way that established consciousness of guilt. The respondent switched clothing with a friend so as not to be detected by the police and left the mall, calling someone to pick him up and saying he was "carrying something." See *People v. Harris*, 52 Ill. 2d 558, 561 (1972) (evidence of flight is admissible as a circumstance tending to show consciousness of guilt). Reviewing courts have upheld trial determinations that the defendant possessed a firearm even where very little description of the weapon was presented. *People v. Jackson*, 2016 IL App (1st) 141448, ¶ 18.

¶ 35    Here, the eyewitness testimony, in conjunction with the surveillance footage and the respondent's behavior after the incident, was sufficient for the trier of fact to conclude that the respondent brandished a firearm. After reviewing the evidence presented in the circuit court and viewing the evidence in the light most favorable to the prosecution, we do not find that the evidence was so improbable or unsatisfactory that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Accordingly, as the respondent has not met his burden to show that no rational trier of fact could have found that the elements of the offense were proven beyond a reasonable doubt, we affirm the respondent's adjudications for AUUW and aggravated assault with a deadly weapon.

¶ 36                                B. One Act, One Crime

¶ 37    The respondent next argues that his adjudications for aggravated assault with a deadly weapon and disorderly conduct violate the one-act, one-crime rule. Although the respondent did not raise the issue within the circuit court below, he asks this court to review the issue under the plain-error doctrine. Our supreme court has held that one-act, one-crime violations fall within the

14

second prong of the plain-error doctrine. *People v. Nunez*, 236 Ill. 2d 488, 493 (2010). Further, our supreme court has held that the one-act, one-crime rule applies in proceedings under the Juvenile Court Act. *In re Samantha V.*, 234 Ill. 2d 359, 375 (2009). Thus, we consider whether a violation of the rule occurred.

¶ 38 The one-act, one-crime rule holds that a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act. *People v. King*, 66 Ill. 2d 551, 566 (1977). Whether a violation of the rule has occurred is a question of law, which we review *de novo*. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). In making this determination, this court has long followed a two-step analysis. *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts. *Id.* If it is determined that the defendant committed multiple acts, the court then moves to the second step and determines whether any of the offenses are lesser-included offenses. *Id.* If none of the offenses are lesser-included offenses, then multiple convictions are proper. *Id.* Further, for a series of closely related acts to count as multiple acts for the purposes of supporting multiple convictions, the State must prosecute the case on such a theory. *People v. Young*, 362 Ill. App. 3d 843 (2005).

¶ 39 Where a one-act, one-crime violation is found, the proper remedy is to vacate the less serious offense. *In re Samantha V.*, 234 Ill. 2d at 379. However, where it cannot be determined which of two or more convictions based on a single physical act is the more serious offense, the cause will be remanded to the circuit court for that determination. *Id.* at 380. In this case, the State charged the respondent with aggravated assault with a deadly weapon and disorderly conduct based on the same singular act: "knowingly brandished a handgun." Thus, as the State concedes, both counts alleged the same conduct. Accordingly, the respondent's adjudication for disorderly conduct, the less serious offense, must be vacated. See 720 ILCS 5/12-2(d), 26-1(b) (West 2022)

15

(aggravated assault with a deadly weapon, a Class A misdemeanor, is the more serious offense where disorderly conduct is a Class C misdemeanor).

¶ 40                           III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the circuit court's adjudication of delinquency on count 1, AUUW, and count 2, aggravated assault. We vacate the respondent's adjudication for disorderly conduct, count 3.

¶ 42    Affirmed in part and vacated in part.